O

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALDEMAR PORTNEY, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CIBA VISION CORPORATION, a Delaware corporation,<br><br>Defendant. | CASE NO. SACV 07-0854 AG (MLGx)<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

Plaintiff Valdemar Portney ("Plaintiff") brought a motion for summary judgment (the "Motion") against defendant CIBA Vision Corporation ("Defendant"). Plaintiff moves for summary judgment on Defendant's first counterclaim for inequitable conduct, fifth counterclaim for fraud, and ninth counterclaim for unfair competition. After reviewing the papers and effective arguments by both sides, genuine issues of material fact remain. Thus, the Court DENIES the Motion.

**BACKGROUND**

Plaintiff filed this lawsuit to recover royalties under the Sublicense Agreement.

Plaintiff learned about a progressive contact lens design in a personal meeting with Dr. Howard Barnett, now deceased ("Barnett"). (Def.'s Statement of Additional Facts, Jan. 16, 2009 ("SAF") ¶¶ 33, 34.) Soon after, Plaintiff got a copy of a paper by Scott Hinkle and Dr. Gerald Lowther (the "Hinkle Paper") that disclosed measured values of the power profiles of samples of a miltifocal contact lens called Bi-Soft, forthcoming from Defendant. (*Id.* ¶¶ 35, 36.) The Hinkle Paper described the lens as having "a central distance zone, a peripheral near power with a transition region between the two zones." (*Id.* ¶ 35.) Plaintiff pasted a power profile from the Hinkle Paper into his own paper, where he explored the concept of a progressive lens, describing the progressive contact lens design as "Dr. Barnett's design." (*Id.* ¶ 37.) Plaintiff's paper said the Barnett lens worked like a "pinhole." (*Id.* ¶ 67.) In a later paper, Plaintiff described the Barnett lens as having "progressively varying focal length." (*Id.* ¶ 39.)

Lowther wrote another paper (the "Lowther Paper") discussing clinical trials of the Barnett lens. He noted that "intermediate vision was good for most patients due to the power distribution across the lens. The lens functioned in many cases as a multifocal rather than just a bifocal with good vision from infinity up to the near point reading position." (Def.'s SAF ¶ 41.) He described the lens as having "a small central distance portion surrounded by an aspheric transition zone and then a spherical near portion in the periphery." (*Id.* ¶ 42.)

Plaintiff filed an application for U.S. Patent No, 4,898,461 (the "'461 Patent") with the PTO. The application was assigned to PTO Examiner Callaghan ("Callaghan"). The application described Plaintiff's invention as "combining (a) a series of alternating power zones with (b) a continuously varying power within each zone, as well as in transition from one zone to another." (Def.'s SAF ¶ 49.) The application said that the invention had "a plurality of concentric zones" in which "the variation from far to near vision correction is continuous, i.e., from near correction focal power to far correction focal power, then back to near, and again back to far, or vice verse [sic]. This change is continuous (progressive), without any abrupt correction

1  changes, or 'edges.'" (*Id.*)

2  In conjunction with the application for the '461 Patent, Plaintiff submitted to the PTO a document entitled "Prior Art Information." (Def.'s SAF ¶ 52.) It did not mention the Barnett lens. (*Id.* ¶ 53.) At no time during the prosecution of the '461 Patent did Plaintiff or Plaintiff's business associate Tim Willis ("Willis") disclose to Callaghan the Barnett lens, the Hinkle Paper, the Lowther Paper, or the knowledge that Defendant was selling the Bi-Soft lens. (*Id.* ¶¶ 560-63.)

Willis twice wrote to Barnett, just before and just after Plaintiff filed the application for the '461 Patent. In these letters, cc'ed to Plaintiff, Willis sought to "revisit discussion on your bifocal/multifocal concept," asking Barnett about his patents, seeking "contact lense samples," and asking him to contact Plaintiff directly. (Def.'s SAF ¶ 50.)

Twice, Callaghan rejected all of Plaintiff's claims, finding them obvious in light of preexisting patents. (Def.'s SAF ¶ 54.) Plaintiff responded that polishing edges like those in the preexisting patents did not generate progressive, intermediate vision. (*Id.* ¶ 55.) Instead, they generated a fault, with sharp jumps in power. (*Id.*)

During the examination of the application for the '461 Patent, Callaghan interviewed Plaintiff, Willis, and their attorney. (Pl.'s Uncontroverted Facts, Dec. 31, 2008 ("UF") No. 24; Def.'s SAF ¶ 68.) After the interview, Callaghan prepared an Examiner Interview Summary Record. (Pl.'s UF No. 25.) In it, he said that they "[d]iscussed the polishing effect produced by De Carle compared to a true progressive effect." (Def.'s SAF ¶ 69.) Later, Plaintiff told Callaghan that he had made revisions that brought the application in line with the agreement reached during the interview. (Def.'s SAF ¶ 71.) But Callaghan's Examiner Interview Summary Record did not disclose this agreement. (Def.'s SAF ¶ 72.)

Plaintiff filed numerous applications for divisional patents, claiming the benefit of the '461 Patent's filing date. (Pl.'s UF No. 26; Def.'s SAF ¶ 73.) PTO Examiner Sugarman ("Sugarman") examined these applications. (*Id.*) Callaghan's Examiner Interview Summary Record was part of the record for the '461 Patent when Sugarman began examining these applications. (*Id.* 27.) The Examiner Interview Summary Record did not include information

about the restrictive agreement reached between Callaghan and Plaintiff, and neither Plaintiff nor Willis told Sugarman about this agreement.  (*Id.* ¶ 76.)

One of the new applications was a "continuation-in-part" application issued as U.S. Patent No. 5,225,858 (the "'858 Patent").  The '858 application incorporated the text of the '461 Patent by reference but contrasted itself by saying that in the '461 lens, "the progressive vision correction power is varied between far and near through the several zones," while in the '858 lens, "improved image quality . . . [is] accomplished by maintaining the near vision correction power of appropriate zones of the lens substantially constant for a major segment . . . ."  (Def.'s SAF ¶ 80.)

Plaintiff granted AMO an exclusive license to certain technology and patent rights.  (Pl.'s UF No. 1.)  AMO and Defendant entered into a sublicense agreement whereby AMO granted Defendant a sublicense to the technology and patent rights.  (*Id.* No. 2.)  Plaintiff asserts that during the sublicense negotiations, Defendant did not communicate with Plaintiff.  (*Id.* No. 20.)  Plaintiff also asserts that Plaintiff did not draft the sublicense.  (*Id.* No. 21.)  Defendant asserts that Willis was Plaintiff's agent, and Willis was obligated to "[p]erform negotiations for the licensing" of the patents on Plaintiff's behalf.  (Def.'s SAF ¶ 100.)  Defendant says Willis drafted the sublicense with Plaintiff's help.  (*Id.* ¶ 104.)

Under the Sublicense Agreement, Defendant promised to pay Plaintiff royalties for the sale of contact lenses using the technology and patent rights.  (Pl.'s Ex. 10.)  In a Consulting Side-Agreement incorporated into the sublicense, Plaintiff agreed to visit Defendant to transfer technical information.  (Mot. 3:19-22.)  Defendant agreed to pay Plaintiff $375,000 for his visits.  (*Id.*)  In the Consulting Side-Agreement, Plaintiff said he was "an expert on multifocal optics."  (Def.'s SAF ¶ 122.)  Soon after, he said he had "limited knowledge about contact lenses" and "would require . . . assistance and consultation."  (*Id.* ¶ 92.)

The Sublicense Agreement contained a list of licensed patent rights.  (Def.'s SAF ¶¶ 107, 108.)  Patent 08/122,822 (the "'822 Application") was pending at the time the sublicense was created, but it was not included in the list.  (*Id.* ¶¶ 111, 112.)  Plaintiff reviewed the '822 Application before it was filed and submitted a declaration to the PTO.  (*Id.* 113-16.)

## LEGAL STANDARD

Summary judgment is appropriate only where the record, read in the light most favorable to the non-moving party, indicates that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Material facts are those necessary to the proof or defense of a claim, as determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If, and only if, the moving party meets its burden, then the non-moving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. *Id.* at 322-23. If the non-moving party meets this burden, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

## ANALYSIS

**1.    DEFENDANT'S FIRST COUNTERCLAIM FOR INEQUITABLE CONDUCT**

Defendant has satisfied its burden of showing there is a genuine issue of material fact as to its first counterclaim for inequitable conduct. "Inequitable conduct occurs when a patentee breaches his or her duty to the PTO of candor, good faith, and honesty." *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1342 (Fed. Cir. 2005) (internal quotation omitted). This breach of duty happens when a person substantively involved in the prosecution of a United States patent: (1) either makes an affirmative misrepresentation of a material fact or fails to

5

disclose material information to the Patent Office, and (2) does so with the intent to deceive. *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1362 (Fed. Cir. 2003). Thus, to assert successfully a defense of unenforceability due to inequitable conduct, a defendant must prove, by clear and convincing evidence, both a material misrepresentation and an intent to deceive the Patent Office. *Id.*

Defendant asserts that Plaintiff committed inequitable conduct in three ways: (1) nondisclosure of the Barnett lens, (2) concealment of the agreement with Callaghan from Sugarman, and (3) misrepresentations to gain a four-year term extension for the '461 Patent.

### 1.1 Nondisclosure of the Barnett lens

Plaintiff argues that there is no evidence that Plaintiff or Willis had the Barnett lenses, the Barnett '006 Patent, or the Lowther Paper. The Court disagrees. Defendant has presented evidence that Plaintiff and Willis met with Barnett, that Plaintiff had possession of the Hinkle Paper, and that Plaintiff pasted a power profile from the Hinkle Paper into his own paper, even referring to the power profile as "Dr. Barnett's Design." Willis sent Barnett letters just before and just after the application for the '461 Patent. Also, Plaintiff admitted that Barnett's pinhole concept influenced his own ideas. Defendant has produced sufficient evidence to create a genuine issue as to whether Plaintiff possessed the Barnett lens and related papers.

Plaintiff argues that even if Defendant can show possession, Defendant cannot satisfy its burden as to materiality because the Barnett lens is cumulative of the content of the '461 specification. Plaintiff's own deposition shows that there is at least a genuine issue as to whether this is the case. (Def.'s SAF ¶ 59.) .

Finally, Plaintiff argues that Defendant cannot satisfy his burden of showing intent. Again, the Court disagrees. Indirect and circumstantial evidence must be "clear and convincing" to create an inference of deceptive intent. *Star Scientific v. RJ Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008). But direct evidence of intent is rare, and "[g]enerally, intent must be inferred." *Paragon Podiatry Lab. v. KLM Lab.*, 984 F.2d 1182, 1189 (Fed. Cir. 1993). Here,

Defendant has provided sufficient evidence to create a genuine issue as to intent.

### 1.2 Concealment of the agreement with Callaghan from Sugarman

Defendant argues that Plaintiff concealed the agreement with Callaghan from Sugarman. Plaintiff argues that any agreement between Plaintiff and Callaghan would have been part of the Examiner Interview Summary Record, which would have been available to Sugarman. But Callaghan's Examiner Interview Summary Record did not include this information. Instead, the information was part of Plaintiff's post-interview remarks. All Plaintiff had to do was tell Sugarman about the agreement with Callaghan. But there is no indication that Plaintiff did this. Defendant has satisfied its burden both as to materiality and as to intent.

### 1.3 Misrepresentations to gain a four-year term extension for the '461 Patent

Defendant argues that Plaintiff told the PTO that the power profile for the ARRAY lens was covered by the '461 claims when Plaintiff knew that it was actually covered by the '858 patent. In fact, Plaintiff told the '858 Examiner that the '858 lens was distinct from the '461 lens because the '858 lens had "a major segment" in which the power "is substantially constant." (Def.'s SAF ¶¶ 82,85-87,89.) The ARRAY profile has this exact same feature. (*Id.*)

Defendant presents evidence that indicates Plaintiff said two opposite things at different times. First, he said the '858 claims were not a double patenting of the '461 claims because of major segments of constant power. (Def.'s SAF ¶ 82.) Then during the '461 term extension hearing he said the '461 claims did cover the '858 lens, including its major segments of constant power. (*Id.* ¶ 85.)

Defendant provides adequate evidence to create a genuine issue of materiality and intent as to whether Plaintiff misrepresented to the PTO in order to gain an extension for the '461 Patent.

1.4     Conclusion

Defendant has satisfied its burden of showing that there is a genuine issue as to nondisclosure of the Barnett lens, concealment of the agreement with Callaghan from Sugarman, and misrepresentations to gain a four-year term extension for the '461 Patent.  The Court DENIES the motion as to Defendant's second counterclaim for inequitable conduct.

## 2. DEFENDANT'S FIFTH COUNTERCLAIM FOR FRAUD

Defendant alleges that Plaintiff committed fraud in the inducement on two theories: (1) that Plaintiff failed to disclose that he intended to continue the prosecution of the '461 Patent family through a series of new applications seeking broader claims, and (2) by falsely representing that the patent rights were enforceable and knowingly failing to disclose that the '461 Patent had been obtained by inequitable conduct.

Plaintiff argues that Defendant's fraud claim is time-barred and that Defendant cannot meet its burden of proof on its fraud claim.  The required elements of a fraud claim are: (1) misrepresentation (false representation, concealment, or nondisclosure), (2) knowledge of falsity (or "scienter"), (3) intent to defraud, i.e., to induce reliance, (4) justifiable reliance, and (5) resulting damage.  *Philipson & Simon v. Gulsvig*, 154 Cal. App. 4th 347, 365 (Cal. Ct. App. 2007); *see also Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (Cal. 1995).  Plaintiff argues that Defendant cannot satisfy the first, third, fourth, and fifth prongs.

2.1     Statute of limitations

Fraud claims are subject to a three-year statute of limitations.  Cal. Civ. Proc. Code § 338(d).  The statute of limitations begins to run on discovery.  *Id.*  A plaintiff "discovers" its claim when it has actual or constructive knowledge of the claim.  *Weir v. Snow*, 210 Cal. App. 2d 283, 292 (Cal. Ct. App. 1962).

Plaintiff argues that issuance of a patent constitutes constructive notice. In this case, the 656 Patent issued in 1996, 11 years before Plaintiff filed his suit. Plaintiff argues that Defendant had constructive notice in 1996, so Defendant's fraud claim is time-barred.

Plaintiff does not provide sufficient authority to support his argument that issuance of a patent constitutes constructive notice for the purpose of determining the start of a limitations period. In fact, as the California Court of Appeal said, "[W]e have found no case suggesting the existence of public records precludes the application of the delayed discovery doctrine as a matter of law." *Prudential Home Mortgage Co. v. Superior Court*, 66 Cal. App. 4th 1236, 1247 (Cal. Ct. App. 1998); *see also Applera Corp.-Applied Biosystems Group v. Illumina Inc.*, 2008 WL 927963 * 1 (N.D. Cal. Apr. 4, 2008) (noting that "[n]o federal decision" has ever found a claim time-barred based on constructive notice of patent issuance).

The statute of limitations did not begin to run when Plaintiff's patent issued in 1996. Defendant's fraud claim is not time-barred.

### 2.2 Misrepresentation and Intent to defraud

The Sublicense Agreement defines "Patent Rights" as "any United States or foreign patent(s) and applications for patent and all continuations, continuation-in-part, reissues or reexaminations thereof owned or sublicenseable [sic] by AMO under the License Agreement, relating to multifocal lenses, as currently set forth in Exhibit A hereto." (Def.'s SAF ¶ 140.) But the '822 Application, which was pending before the PTO at the time, was not listed in Exhibit A.

Plaintiff argues that this is not enough to show misrepresentation on his part because he did not draft the sublicense and no employee of Defendant spoke to him during the negotiations. Even if this is true, it does not let Plaintiff off the hook. Plaintiff's agents drafted the sublicense, possibly with detailed input from Plaintiff. Plaintiff signed the sublicense agreement. (Mot. 7:28.) Also, at the time Plaintiff signed the sublicense agreement, he had an updated list of the Patent Rights, which he himself later produced in discovery. (Def.'s SAF ¶ 94.)

Defendant also argues that Plaintiff misrepresented about his claim to be an expert on

1  contact lenses and his statements that the Patent Rights were enforceable.  A genuine issue exists
2  as to whether Plaintiff misrepresented to Defendant and whether Plaintiff did so with intent to
3  defraud.
4
5       2.3     <u>Reliance</u>
6
7       Reliance occurs when, absent the misrepresentation, the contracting party "would not, in
8  all reasonable probability, have entered into the contract or other transaction." *Schauer v.*
9  *Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949, 960 (Cal. Ct. App. 2005).  Plaintiff argues
10 that actual or justifiable reliance does not exist as to Defendant's first fraud theory because
11 Defendant cannot prove that it would have acted differently if Exhibit A had been updated.
12 (Mot. 8:24-25.)  But Defendant provides sufficient evidence that it would have acted differently
13 if it had known about the '822 Application.  Defendant "would have been alarmed to learn that
14 [it] might be on the hook relating to other products when [it wasn't] aware of that when [it] made
15 the arrangement." (Def.'s SAF ¶ 145.)  Defendant presents sufficient evidence to create a
16 genuine issue as to reliance.
17
18      2.4     <u>Damages</u>
19
20      Plaintiff claims that Defendant cannot meet its burden of proof that it has been damaged.
21 "Fraud without damage furnishes no ground for action." *Empire West v. S. Cal. Gas Co.*, 12
22 Cal. 3d 805, 811 (Cal. 1974).  Here, Defendant provides sufficient evidence of damages.
23 Defendant paid Plaintiff $375,000 under the Consulting Side-Agreement.  Also, a more
24 extensive sublicense will result in Defendant paying greater licensing fees to Plaintiff.
25
26
27
28

    2.5    <u>Conclusion</u>

Defendant's fraud counterclaim is not barred by the statute of limitations. Also, Defendant provides evidence to create a genuine issue as to misrepresentation, intent to defraud, reliance, and damages. Thus, the Court DENIES the Motion as to Defendant's fifth counterclaim for fraud.

## 3. DEFENDANT'S NINTH COUNTERCLAIM FOR UNFAIR COMPETITION

    3.1    <u>Statute of limitations</u>

A four-year statute of limitations governs unfair competition claims. Cal. Bus. & Prof. Code § 17208. Courts are divided about whether the discovery rule applies to unfair competition claims. Some courts have concluded that it does apply. *See, e.g., Mass. Mutual Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1295 (Cal. Ct. App. 2002). Others have concluded that it does not. *See, e.g., Snapp & Assoc. Ins. Servs., Inc. v. Robertson*, 96 Cal. App. 4th 884, 891 (Cal. Ct. App. 2002). Recently, the Supreme Court of California noted this split. *Grisham v. Philip Morris U.S.A.*, *Inc.*, 40 Cal. 4th 623, 635 n. 7 (2007). While warning that it was not resolving the conflict, the Supreme Court of California "assume[d] for the purposes of this discussion that the delayed discovery rule applies to unfair competition claims." *Id*; *see also Garcia v. Coleman*, 2008 WL 4166854 * 10 (N.D. Cal. Sept. 8, 2008) ("[T]he Court assumes that the discovery rule is applicable, both to the claims for statutory and unfair competition, and the Court shall not grant summary judgment on this ground."). Given the disagreement on this topic, and noting the recent trend toward applying the discovery rule, this Court will not bar Defendant's unfair competition claim by finding that the discovery rule does not apply.

### 3.2 Relationship to fraud claim

California Business and Professions Code Section 17200 "'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (Cal. 1999). If the borrowed violations of law or predicate claims lack merit, then the unfair competition claim necessarily fails. *See, e.g., Cyntegra, Inc. v. Idexx Labs.,* 520 F. Supp. 2d 1199, 1212 (C.D. Cal. 2007). Plaintiff argues that Defendant's fraud counterclaim lacks merit, so Defendant's unfair competition counterclaim must also fail. In Section 2, the Court concluded that Defendant's fraud counterclaim has merit. Thus, the unfair competition counterclaim does not fail.

### 3.3 Conclusion

Defendant's counterclaim for unfair competition is not barred by the statute of limitations and does not fail because of its relationship to the fraud claim. The Court DENIES the Motion as to Defendant's counterclaim for unfair competition.

## 4. CONCLUSION

Defendant provides sufficient evidence to create a genuine issue as to its first counterclaim for inequitable conduct, fifth counterclaim for fraud, and ninth counterclaim for unfair competition, as well as related defenses numbers three and 11.

**DISPOSITION**

The Court DENIES the Motion.

IT IS SO ORDERED.

DATED: February 6, 2009

_____
Andrew J. Guilford
United States District Judge