O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALDEMAR PORTNEY,<br>an individual,<br><br>    Plaintiff/<br>    Counterclaim-Defendant,<br><br>v.<br><br>CIBA VISION CORPORATION,<br>a Delaware Corporation,<br><br>    Defendant/<br>    Counterclaim-Plaintiff. | Case No.  SACV07-854-AG (MLGx)<br><br>**ORDER REGARDING CLAIM CONSTRUCTION** |

- 1 -

Before the Court are the claim construction arguments of the parties. Extensive arguments were presented in the papers and at oral argument. After reviewing all arguments, the Court has determined the proper claim constructions of the disputed terms.

**1.    BACKGROUND**

Plaintiff Valdemar Portney ("Portney") has accused defendant CIBA Vision Corp. ("CIBA Vision") of using 140 claims of 6 U.S. patents, 6 non-U.S. patents, and either 2 or 3 non-U.S. patent applications. The U.S. patents are U.S. Patent Nos. 4,898,461; 5,166,711; 5,260,744; 5,657,108; 8,577,839; and 6,186,625. The 6 non-U.S. patents are Brazil BR8807089-1; Japan JP2-500468, JP6-023815; Norway NO179629, NO890376; Europe EP0318561; Australia AU605332; and Canada CA1326389. The non-U.S. patent applications are JP 2-500468, NO 890376, and BR 8807089 A. Each of these patents and applications claims priority to the 1987 application that became U.S. Patent No. 4,898,461 ("the '461 patent").

All of the claims asserted in this litigation include a term denoting that the claimed invention is a type of multifocal lens. These terms are:

- A multifocal ophthalmic lens;
- An ophthalmic lens . . . to provide vision correction over a wide range of viewing distances;
- Ophthalmic lens . . . to provide correction of vision over a wide range of distances;
- A multifocal ophthalmic lens for providing variable vision correction power;
- An ophthalmic lens . . . for providing variable vision correction power[s];
- Ophthalmic lens . . . to provide the power of correction of variable vision;
- A method of vision correction . . . to provide progressive vision correction powers;

- A method . . . including progressive vision correction powers;
- A multifocal surface;
- A multifocal ocular lens;
- Ocular lens . . . to bring about a variable vision correction performance; and
- Ophthalmic lens . . . to provide variable vision correction.

[U.S. Patent Nos. 4,898,461; 5,166,711; 5,260,744; 5,657,108; 8,577,839; 6,186,625; Brazil BR8807089-1 and translation; Japan JP2500468 and translation; JP6023815 and translation; Norway NO179629 and translation; NO890376 and translation; Europe EP0318561; Australia AU605332; Canada CA1326389; BR 8807089 A and translation)]. These phrases are collectively referred to herein as "a multifocal ophthalmic lens." The proper construction of each of these phrases is before the Court.

Plaintiff has argued that two of these phrases "relate to 'method claims'" and therefore cannot be referred to as "a multifocal ophthalmic lens." [Portney's Opening Brief on Patent Claim Construction at 23]. But the method claims are not simply a collection of process steps. Rather, they have structural requirements. The claims all say "progressive" and require a "surface." That surface is the multifocal lens Portney claims to have invented, so the method claims cannot be practiced without creating "a multifocal ophthalmic lens." *See Dealertrack Inc. v. Huber*, No. 06-CV-2335 AG, Slip. Op. at 16 (C.D.Cal. Sept. 27, 2008) ("computer based method" in preamble was a limitation).

Before this litigation, all of the U.S. patents-in-suit were the subject of litigation in the U.S. District Court for the Eastern District of Texas between Portney's company Vision Advancement, LLC and non-party Vistakon. *Vision Advancement, LLC v. Vistakon,* Civil Action No. 2:05cv455 (E.D. Tex.). In the *Vistakon* litigation, Magistrate Judge Love issued a claim construction opinion and order that was adopted in full by Judge Davis. But he was not asked to construe and did not construe the terms currently before this Court. (Memorandum Opinion

and Order ("*Vistakon* Claim Construction Decision"), *Vision Advancement, LLC v. Vistakon,* Civil Action No. 2:05cv455 (E.D. Tex. Jan. 26, 2007)).

CIBA Vision proposes that in the context of the Portney Patents "a multifocal ophthalmic lens" (and all of the listed variants) should be construed as "a multifocal ophthalmic lens (1) that has no segment of constant (*i.e.*, spherical) curvature except (optionally) at the center, and (2) that contains at least 2 cycles in which vision correction power moves from Far to Near and back to Far (or *vice versa* from Near to Far to Near), and (3) that has the same Near power in each cycle and the same Far power in each cycle." (CIBA Vision's Opening Claim Construction Brief at 8-9.) Portney proposes that the court simply adopt the "ordinary and customary meaning of the claim terms at issue." (Portney's Opening Brief on Patent Claim Construction at 1.)

The Court finds CIBA Vision's arguments to be more persuasive and construes the claims with the limiting language provided by CIBA Vision.

## 2. **LEGAL STANDARD**

Claim construction is an issue of law "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). "The claim 'define[s] the scope of a patent grant.'" *Id.* at 373 (alteration in original; citation omitted). Thus, the purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996).

When construing the claims of a patent, a court should look "to the intrinsic evidence of record, *i.e.,* the patent itself, including the claims, the specification, and, if in evidence, the prosecution history." *Vitronics Corp v. Conceptronic Inc.*, 90 F.3d 1579, 1582 (Fed. Cir. 1996). The court also may "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution

history, including expert and inventor testimony, dictionaries, and learned treatises'" if the Court deems such extrinsic evidence helpful in determining "'the true meaning of language used in the patent claims.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317-18 (Fed. Cir. 2005) (en banc) (quoting *Markman*, 52 F.3d at 980).

"[P]atents are addressed to and intended to be read by others of skill in the pertinent art." *Id.* at 1313. The proper definition of a claim term is the "definition that one of ordinary skill in the art could ascertain from the intrinsic evidence in the record." *Id.*

"The claims, of course do not stand alone. Rather they are part of a 'fully integrated written instrument.'" *Phillips*, 415 F.3d at 1315. It is not the claims alone where "the invention" is found. It's also required that "the invention" be set out in the specification. *Id.* at 1316; 35 U.S.C. § 112 ¶ 1. Thus, the claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1316. The specification is thus "the primary basis for construing the claims" and "the single best guide to the meaning of a disputed term." *Id.* "[U]pon reading the specification . . . , it will become clear whether the patentee is setting out specific examples . . . , or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." *Phillips*, 415 F.3d at 1323 (citing *SciMed Life Sys. Inc. v. Advanced Cardio. Sys. Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("when the preferred embodiment is described as the invention itself, the claims are not entitled to a broader scope than the embodiment")).

**3.  ANALYSIS**

    **3.1  SPECIFICATION**

The specification common to all the patents-in-suit uses the term "the present invention" 5 times to describe the 2 embodiments for achieving multifocality. Judge Love in the *Vistakon* claim construction opinion expressly found that only those 2 ways of implementing multifocality (undulating surface and ion

1    implantation) were disclosed. (*Vistakon* Claim Construction Decision at 16.) And
2    "each term must be construed to implement the invention described in the
3    specification." *On Demand Mach. Corp. v. Ingram, Inc.,* 442 F.3d 1331, 1344
4    (Fed. Cir. 2006).

5        As originally filed in 1987 (and as issued), Portney's '461 patent announces
6    his invention as follows:

### ABSTRACT

> An improved ophthalmic lens is disclosed which has <u>a plurality of alternating power zones</u> with a <u>continuously varying power within each zone</u>, as well as in transition from one zone to another. In other words, a plurality of concentric zones (<u>at least two</u>) are provided in which <u>the variation from far to near vision correction is continuous</u>, i.e., <u>from near</u> correction focal power <u>to far</u> correction focal power, <u>then back to near</u>, and <u>again back to far</u>, or vice versa. This change is <u>continuous (progressive), without any abrupt correction changes, or "edges"</u>. Two versions of the invention are disclosed. In the first version continuous, alternating power variation is accomplished by a <u>continuously changing curvature of the lens</u> posterior surface, thereby altering the angle of impact of light rays on the eye. In the second version continuous, alternating power variation is accomplished by creating non-homogeneous surface characteristics having <u>refractive material indexes which continuously vary</u> in the lens radial direction (out from the optical axis).

(U.S. Patent Application No. 056,050 ("'050 App.") at 20; '461 patent (all underscoring in quotations is added unless otherwise noted).) The desired progressive change in power is accomplished in only 2 ways: a constantly

- 6 -

1 undulating surface or ion implantation. The application continues by saying exactly
2 what is "the present invention":

### SUMMARY OF THE INVENTION

<u>The present invention</u> provides an improved multifocal ophthalmic lens by <u>combining (a) a series of alternating power zones</u> with <u>(b) a continuously varying power within each zone</u>, <u>as well as in transition</u> from one zone to another. In other words, a plurality of concentric zones (at least two) are provided in which <u>the variation from far to near vision correction is continuous</u>, i.e., from near correction focal power to far correction focal power, then back to near, and again back to far, or vice verse. <u>This change is continuous (progressive), without any abrupt correction changes, or "edges"</u>.

14 ('050 App. at 4; '461 patent, col. 2:35-45.) Thus, the "invention" always has two
15 features: (1) a series of alternating power zones, and (2) continuously varying
16 power across the entire surface, both in the "zones" and in the transitions between
17 zones.

18    Portney has asserted that his invention shows areas of constant/spherical
19 curvature beyond the lens center. (Portney's Opening Brief on Patent Claim
20 Construction at 18.)  But the specification says the opposite: "The present
21 invention provides . . . (b) a continuously varying power within <u>each zone, as well</u>
22 <u>as in transition</u> from one zone to another." ('461 patent, col. 2:35-39.) Both
23 "zones" and "transitions" have continuously changing power. And, at his
24 deposition, Portney agreed that an area of constant power could not be considered a
25 progressive area. (Portney Dep. 140:2-8.)

26    The specification also discusses and distinguishes the prior art with reference
27 to the use of constant/spherical curvature. Figure 1 of the '461 patent describes a
28 "bifocal" contact lens with a central, circular, constant/spherical area for focusing

near objects, surrounded by another constant/spherical area for focusing far objects. ('050 App. at 6-7; '461 patent, col. 3:33-40.) Figure 2 describes a multifocal lens that is completely aspheric (with "continuously changing curvature from its center to its periphery") and thus, "a continuous change of focusing power for . . . far objects . . . to . . . near objects. . . . ." ('050 App. at 7; '461 patent, col. 3:46-58.) The specification then praises the "advantages" of continuously varying power "over" use of constant power. ('050 App. at 7-8; '461 patent, col. 3:59-68.)

The specification then again states what "the present invention" is:

> In order to minimize the problems due to the need for centering, due to pupil size variation, and due to fitting requirements (progressive type), <u>the present invention</u>, as shown in <u>FIG. 4</u>, <u>uses several zones</u>, each of which includes a progressive power change from near correction to far correction. In other words, a three zone contact lens, the progressive variation of the FIG. 2 lens <u>would be repeated six times</u>, three times as a variation from lower to higher power, and three times as a variation from higher to lower power.

('050 App. at 8-9; '461 patent, col. 4:14-23.) The specification then gives this one exception:

> The lens is constructed with <u>a small centrally placed zone of constant curvature</u> to form the power for middle correction. <u>From it the curvature changes</u> to far correction, then to near correction, passing through the middle correction. This <u>alternation is continued to form several zones</u>.

('050 App. at 9; '461 patent, col. 4:23-28.)

The specification continues:

> The higher and lower corrective powers in each zone of the <u>four annular concentric zones</u> shown in FIG. 4, occur as the

<u>undulating curve progresses from one peak 54 to the adjacent valley 56, and then back</u> to the next peak 54.  <u>Except for the small centrally placed zone of a constant curvature</u> which provides power for middle correction, <u>a zone is considered to include a complete cycle</u>, i.e., from the intermediate power through the high power, then back through the intermediate power to the low power, and finally back to the intermediate power.

('050 App. at 11; '461 patent, col. 5:9-19.)

Nowhere does the specification disclose that a Portney lens can have a segment of constant (*i.e.*, spherical) curvature except at the very center of the lens. Portney told the public that the lens surface he invented, except at the very center, is "continuously" varying — not sometimes varying, and sometimes constant.  In the *Vistakon* litigation, Judge Love expressly held that "vary continuously" means "continuously changing." (*Vistakon* Claim Construction Decision at 9.) Because Judge Love had to construe a § 112 ¶ 6 means-plus-function limitation, he had to determine what structures were actually disclosed in the specification. He held that the only structure using curvature to effect progressive vision correction was "an <u>undulating</u> lens posterior surface that has <u>a continuously changing curvature</u>." (*Vistakon* Claim Construction Decision at 16.)  Despite Portney's previous agreement with Judge Love's holding (*Vistakon* Claim Construction Decision at 15), Portney now argues that the PTO nonetheless "determined" in the '461 term extension process that the '461 claims covered the ARRAY lens having constant segments. (Portney's Opening Brief on Patent Claim Construction at 21.)  The PTO, however, can merely take the patentee at his word in the *ex parte* term extension process. 37 C.F.R. § 1.750 ("A determination as to whether a patent is eligible for extension may be made by the Director solely on the basis of the representations contained in the application for extension . . . .").  Accordingly, the

PTO's decision to extend the term of the '461 patent is not helpful for claim construction.

Portney also argues that CIBA Vision's proposed claim construction excludes a disclosed embodiment, namely the "second version" of his invention where a continuous change in power is accomplished by creating multiple indices of refraction by ion implantation. (Portney's Opening Brief on Patent Claim Construction at 13-14.) But it is undisputed that CIBA Vision's accused lenses do not use ion-implantation to create multifocality. They use surface curvature. It is permissible during claim construction to focus on the aspects of the claims that matter for the determination of whether the claims cover the accused product. *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1327 (Fed. Cir. 2006); *Pall Corp. v. Hemasure Inc.*, 191 F.3d 1305, 1308 (Fed. Cir. 1999). This claim construction applies only for structure using curvature to effect progressive vision correction.

Likewise, nowhere does the specification disclose that a Portney lens can have fewer than 2 cycles of Far-to-Near-to-Far (or Near-to-Far-to-Near). Although the word "series" usually means three, in this case it means "at least two" because that is what the patent specification says. There is no indication that Portney contemplated any alternative way to embody or accomplish the curvature-changing version of the invention.

Also, nowhere does the specification disclose that the Far and Near powers in one cycle can be different from the Far and Near powers in another cycle. Although Portney now argues that different Far and Near powers are disclosed in the coordinates included in column 6 of the '461 patent (Portney's Opening Brief on Patent Claim Construction at 18-21), that argument is contradicted by what the specification says occurs in each zone:

> Except for the small centrally placed zone of a constant curvature which provides power for middle correction, a zone is

1         considered to include a complete cycle, i.e., from the
2         intermediate power through <u>the high power</u>, then back through
3         the intermediate power to <u>the low power</u>, and finally back to the
4         intermediate power.

('461 patent, col. 5:13-19.) The specification speaks in the singular: one high power and one low power per lens. As will be discussed, this is confirmed by the prosecution history.

    Portney argues that "multifocal ophthalmic lens" should have its "ordinary and plain meaning" because two prior art lenses discussed in the specification are also called "multifocal ophthalmic lenses." (Portney's Opening Brief on Patent Claim Construction at 11-12.) But the "multifocal ophthalmic lens" for the Court to construe is the one Portney says he invented — the one that follows the words "I claim" and "What is claimed is." Portney cannot claim to have invented the lenses disclosed in NUCHMAN or SCILIPOTI. He claims to have invented only "<u>an improved</u> multifocal ophthalmic lens." ('461 patent, col. 2:35-36.) The nature of that "improvement" is described as "the present invention" and is necessarily different from NUCHMAN or SCILIPOTI.

    Using the same term for the prior art and "the present invention," does not rob that conspicuous phrasing of its dispositive legal effect.

    **3.2 PROSECUTION HISTORY**

    The descriptions of "the present invention" in the specification of the issued patent are echoed by the broadest claim originally filed by Portney in 1987 which also required "power . . . to <u>vary continuously and progressively from a first</u> vision correction <u>value to a second</u> . . . and <u>then back to the first</u> . . . ; <u>each cycle of such continuous variation</u> . . . <u>being repeated in a plurality of zones</u> . . . ." ('050 App. at 17.) The original application also included independent claim 11 which discussed fabrication of the invention by "preparing a lens . . . <u>shaped as segments of spheres</u> . . . ; <u>reshaping</u> . . . one surface . . . by cutting it . . . to create an <u>undulating cross-</u>

sectional curve . . . ; and programming the . . . computer to <u>continuously vary the center of curvature</u> of the cutting tool . . . to form a lens surface which . . . has a <u>progressively varying shape</u> undulating between the adjacent peaks and valleys." ('050 App. at 18-19.) The specification calls this "<u>aspherizing</u> of the surface by utilizing <u>continuous curvature variation</u>." ('050 App. at 5; '461 patent, col. 2:61-62.) Confirming this, the specification says, "[f]or full progressivity, <u>each point</u> on the <u>undulating curve</u> has a <u>different radial center</u> from the centers of the adjacent points." ('050 App. at 12; '461 patent, col. 5:45-47.)

      As already discussed, Portney's argument that different Far and Near powers are disclosed in the coordinates included in column 6 of the '461 patent, (Portney's Opening Brief on Patent Claim Construction at 18-21), is contradicted by the specification, which speaks in the singular: one high power and one low power per lens. The prosecution history confirms that nowhere does the specification disclose that the Far and Near powers in one cycle can be different from the Far and Near powers in another cycle. Portney tried to amend the claims to permit different "Near" and "Far" powers from zone to zone, but the Examiner rejected that amendment as "new matter." ('461 File History, Amendments and Remarks (Jan. 18, 1989); '461 File History, Office Action (Mar. 23, 1989).) Portney acquiesced and removed the amendment. ('461 File History, Amendment (May 23, 1989).) Where an examiner rejects an amendment in this manner, it "implies that the examiner had determined that the [amendment] disclosed new matter." *Dealertrack*, Slip. Op. at 19. Thus, Portney's argument is not only contradicted by what the specification says occurs in each zone but also is almost twenty years late.

      Events during prosecution of the non-U.S. patents also support CIBA Vision's proposed claim construction. The European Patent Office rejected claim 1 of Portney's European patent application because it did not recite "features [that] appear <u>essential in order to realize the invention</u>" including "<u>continuously varying power within</u> each zone, <u>as well as in transition</u> from one zone to another."

(European Patent Office Examination Report at ¶ 1(c) (June 11, 1993).) Responding to a rejection by the Canadian Patent Office, Portney stated "One feature of applicant's multifocal ophthalmic lens is the provision of multiple progressive power regions." (CA1326389 File History, Official Action (Jan. 18, 1993) & Remarks (May 18, 1993).)

### 3.3 PORTNEY'S SUBSEQUENT CONTINUATION-IN-PART PATENT APPLICATION

CIBA Vision's proposed claim construction is supported by other evidence. In 1991, Portney filed a "continuation-in-part" ("CIP") of the '461 patent which ultimately became U.S. Patent No. 5,225,858 (which CIBA Vision is not accused of infringing). In it, Portney characterized the '461 invention and distinguished the '858 invention. "The '858 application incorporated the text of the '461 Patent by reference but contrasted itself by saying that in the '461 lens, 'the progressive vision correction power is varied between far and near through the several zones,' while in the '858 lens, 'improved image quality . . . [is] accomplished by maintaining the near vision correction power of appropriate zones of the lens substantially constant for a major segment . . . .'" (Order Denying Portney's Motion for Partial Summary Judgment at 4, Dkt. No. 295 (Feb. 6, 2009); '858 patent, col. 1:18-29 and col. 1:64–2:17.)

Examiner Sugarman rejected all claims of the '858 CIP application on the basis of "obviousness-type double patenting," saying that the CIP's claims were not patentably distinct from the '461 patent. ('858 File History, Office Action (July 29, 1992).) In seeking to identify a patentable difference, Portney pointed to the following characteristic of the '858 invention: "In addition, each of the regions have 'a major segment in which the near vision correction power is substantially constant.'" ('858 File History, Response to Office Action (Nov. 30, 1992).) Examiner Sugarman apparently agreed this made the '461 and '858 different. He

issued a Notice of Allowability. ('858 File History, Notice of Allowability (Feb. 23, 1993).) Portney thus overcame a double patenting rejection of the '858 continuation-in-part application by saying that the '858 claims were patentably distinct from the '461 claims because the '858 invention had "<u>a major segment</u> in which the near vision correction <u>power is substantially constant</u>." That is a clear and unmistakable statement by Portney that the '461 claims do not include major segments of constant power.

### 3.4 EXTRINSIC EVIDENCE

During the *Vistakon* litigation, Portney issued an Expert Report admitting as follows:

> Thus, the objective of <u>my new multifocal lens</u> was to offer a continuous vision from distant to near similar to one produced by a pin-hole. . . . A continuous power variation <u>can be produced by changing a surface shape, *i. e.* varying surface curvature over the lens surface</u>.
>
> . . . . In order <u>to accomplish this</u> objective the <u>power variation from distant to near must be repeated over the lens surface</u>. . . .
>
> Thus, <u>my multi focal lens invention</u> is based upon two concepts: (1) <u>continuous vision</u> from distant through intermediate to near and (2) <u>repeatability of regions of the power over the lens surface</u>.

(Feb. 28, 2007 Portney Expert Report at 4.) As already discussed, the court issued a *Markman* ruling in that case. The court was not asked to rule on the exact scope of "multifocal ophthalmic lens," but several rulings support CIBA Vision's proposed claim construction. For example, Judge Love held that "the claim language . . . requires that the power 'vary continuously', which is the <u>same as</u>

- 14 -

'continuously changing.'" (*Vistakon* Claim Construction Decision at 9.) He also explained that "the <u>only embodiment</u> disclosed in the Portney Patents to demonstrate how vision correction power was adjusted . . . depicted a <u>lens surface that gradually transitioned</u> between high and low vision correction powers, through intermediate . . . ." *Id*. at 9-10. Indeed, he said: "The parties also substantially agree that the corresponding structures are the <u>only two structures disclosed</u> in the Portney Patents for carrying out the recited functions. <u>Both parties agree</u> . . . the first structure is an <u>undulating lens posterior surface</u> that has <u>a continuously changing curvature</u> . . . ." *Id*. at 15.

The Patent Office has interpreted Portney's '461 patent consistent with CIBA Vision's proposed claim construction. In 1995, Dr. John De Carle filed a patent for a multifocal contact lens that had Far ("Distance") zones with a spherical surface (*i.e.*, constant curvature) and Near zones with aspheric surfaces (*i.e.*, with a continuously changing curvature). (U.S. Patent No. 5,798,817 at 1:64–2:3.) Examiner Sugarman was assigned to the application, the same Examiner assigned to all of the Portney Patent Family U.S. applications after the '461 patent. Examiner Sugarman issued a § 102 rejection, saying claims were anticipated (not novel and not patentable) by the Portney '461 patent. ('817 File History, Office Action Summary (July 22, 1997).) In response, Dr. De Carle argued:

> In the Portney reference, there are no separate near or distance vision zones. . . . <u>there is no distance vision zone in Portney which is spherical, all of the zones</u> in Portney <u>being aspherical</u>.

('817 File History, Amendment and Remarks (Nov. 21, 1997) at 3.) Examiner Sugarman accepted the argument and allowed the De Carle patent. ('817 File History, Notice of Allowability (Feb. 17, 1998).) Thus, persons of skill in the art, Dr. De Carle and Examiner Sugarman, agreed that "<u>all</u> of the zones in Portney ['461 are] <u>aspherical</u>."

The correctness of CIBA Vision's proposed claim construction is confirmed

by the expert testimony of Dr. Duncan Moore. Dr. Moore directs his opinions toward the specification itself and says that the terms collectively referred to as "a multifocal ophthalmic lens" should be construed as proposed by CIBA Vision because a person of ordinary skill in the art would understand the "multifocal ophthalmic lens" of the patent to be the particular kind of lens invented by Dr. Portney and not just any multifocal lens in the abstract. (Moore Rebuttal ¶¶ 82-108.)

### 3.5 NON-U.S. PATENTS AND PATENT APPLICATIONS

Finally, Portney argues that the Court should not construe the terms of the asserted non-U.S. claims and that "the foreign patent claims should be given their ordinary meaning by the jury during trial." (Portney's Opening Brief on Patent Claim Construction at 18.) Portney, however, offered no support for his implicit proposition that non-U.S. claims are not construed by a court before infringement is determined. Of course *Markman*, as such, doesn't apply abroad. It holds that judges, not juries, interpret claims. Non-jury countries would not ask the question *Markman* answered. But claims still must be construed.

Portney cited no authority that non-U.S. jurisdictions would ever let a jury construe their patent claims, and it is contrary to U.S. authority not to instruct the jury on all material issues. *Sulzer Textil AG v. Picanol NV*, 358 F.3d 1356, 1366 (Fed. Cir. 2004). Accordingly, the Court will construe the asserted non-U.S. patent claims. Portney gives no reason why the scope of non-U.S. patent claims would be different. All claim priority to the '461 patent.

### 4. CONCLUSION

The Court therefore construes the term "multifocal ophthalmic lens" in the context of the Portney Patents as having the following scope: "a multifocal ophthalmic lens (1) that has no segment of constant (*i.e.*, spherical) curvature except (optionally) at the center, and (2) that contains at least 2 cycles in which vision correction power moves from Far to Near and back to Far (or *vice versa* from

Near to Far to Near), and (3) that has the same Near power in each cycle and the same Far power in each cycle."

These claim constructions shall govern this case.

IT IS SO ORDERED.

DATED: December 23, 2009

Hon. Andrew J. Guilford
United States District Judge